# United States Court of Appeals

### For the Eighth Circuit

_____

No. 21-2469

_____

United States of America

*Plaintiff - Appellee*

v.

Tawhyne M. Patterson, Sr.

*Defendant - Appellant*

_____

No. 21-2485

_____

United States of America

*Plaintiff - Appellee*

v.

Damon D. Williams, also known as Damo

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: November 15, 2022
Filed: May 23, 2023

_____

Before BENTON, KELLY, and ERICKSON, Circuit Judges.
_____

ERICKSON, Circuit Judge.

Tawhyne Patterson and Damon Williams appeal their convictions and sentences arising out of an attempted robbery that resulted in Jessica Brandon's death. For the reasons that follow, we reverse and vacate Patterson's and Williams' convictions on Count One, affirm the remaining convictions, vacate the remaining sentences under the sentencing package doctrine, and remand for proceedings consistent with this opinion.

## I.    BACKGROUND

At approximately 3:30 a.m. on July 31, 2018, three individuals, who were later identified as Tawhyne Patterson ("Patterson"), Damon Williams ("Damon"), and Dante Williams ("Dante"), forcibly entered a residence in Lincoln, Nebraska, that was shared by Jessica Brandon and Michael Robertson. In addition to Brandon and Robertson, present in the home and sleeping were four minor females ranging between the ages of 10 and 16 as well as Robertson's mother. The intruders yelled at the occupants to "get down" or "lay flat." The intruders proceeded to bind the feet of the three children sleeping on the main floor with zip ties. Robertson's mother was also bound with zip ties and duct tape. During the commotion, Robertson locked himself inside his bedroom in the basement. Brandon suffered a mortal gunshot wound while heading up the stairs from the basement. Despite lifesaving efforts by Brandon's daughter, responding officers, and medical personnel, Brandon was pronounced dead at the hospital at 4:58 a.m.

While processing the crime scene, officers recovered 12 bullet casings from the stairs leading to the basement and one in the living room on the main floor. They also discovered a monitor in the basement connected to, what was subsequently described by one of the investigating officers as, a "very impressive video

surveillance system" that included night vision. The system consisted of eight cameras, high quality digital video recordings, and was password protected. An examination of the surveillance videos revealed that the morning before the robbery and murder, exterior cameras recorded a vehicle drive by the residence multiple times. It also captured four individuals (one carrying a baseball bat and another carrying a firearm) enter a side gate to the backyard, attempt to open a side door to the residence, walk along the exterior of the house, and then leave. The next morning, at approximately 3:24 a.m., the home's surveillance cameras captured what appeared to be the same vehicle drive by the residence. The video recording showed that eleven minutes later three individuals, wearing the same clothes as the individuals captured on camera the night before, begin to approach the front door by walking alongside the front wall of the house. The individuals were all wearing gloves. Once at the front door, Dante opened the exterior door, Patterson kicked a hole in the interior door, and all three men rushed inside, yelling "LPD! LPD!" When the intruders later fled the house, the cameras captured two shots fired in the front yard. One bullet hit a neighbor's house and the other one was never located.

After the intrusion but before law enforcement arrived, surveillance cameras monitoring the garage's interior recorded Robertson moving a duffle bag around in the garage as though he was attempting to hide it. He then left the garage and returned with a large cooler and placed it on the side of the garage. A short time later, Robertson picked up both the cooler and duffle bag and carried them to his backyard. Officers eventually located the cooler, which concealed 10 pounds of marijuana, inside a detached shed located in the backyard. Officers also seized $85,800 in cash from the house. Each of the bundles of cash seized from different locations in the house tested positive for the presence of THC. In addition, officers recovered a scale, marijuana edibles, and a marijuana smoking device. Based on the investigation, the government concluded and argued to the jury that Damon and Patterson were in financial trouble and had committed this home intrusion for the purpose of robbing a drug dealer of his drugs and money.

On August 7, 2018, the Lincoln Police Department held a press conference during which they released video footage and still photos taken from the surveillance system and announced they had established a tip line. Shortly afterwards, the investigators received a call on the tip line about a woman named Keyana Jennings who had abruptly quit her job shortly after the murder and left town. When investigators followed up on the lead at Jennings' place of employment, several co-workers reported that Jennings had worked with them for approximately two years and quit shortly after Brandon's murder. Investigators also learned that Jennings was in relationship with Patterson, and the pair lived in a rented house in Lincoln with a third person later identified as Damon. They also learned that Damon and Dante were brothers.

After identifying Jennings' and Patterson's address, investigators obtained a search warrant, which authorized them to search the house; an unattached garage; and all trash receptacles for the following items: clothing; hats; winter stocking caps; shoes; bags; backpacks; firearms; all firearm-related items, including ammunition; fingerprints; DNA evidence; items with blood; any surveillance equipment; cellular telephones; and GPS-enabled devices. Investigators executed the warrant on August 11, 2018, and seized several items, including pieces of duct tape; clothing; shoes; boots with duct tape on the left boot; a winter glove, and two pairs of gloves. The gloves recovered from the trash outside the house drew the attention of law enforcement because it was early August and warm outside. Further investigation revealed that Damon's DNA was on the outside of one of the pairs of gloves. Patterson and Damon unsuccessfully moved to suppress the evidence. The district court, adopting the magistrate judge's findings and recommendation, denied the motion without a hearing.

When the Lincoln Police Department discovered that Patterson had pawned items in Killeen, Texas, it expanded its investigation and began working with law enforcement officers employed by the Texas Department of Public Safety. Special

Agent Jari McPherson[1] applied for a search warrant of a single-family residence in Killeen, Texas. The supporting affidavit identified Patterson, Dante, and Damon as suspects in an ongoing homicide investigation in Lincoln, Nebraska. The affidavit further provided detailed information about (1) the home invasion; (2) the suspects in the murder investigation; (3) the seizure of multiple pounds of marijuana, marijuana edibles, and over $85,000 in cash from the crime scene; and (4) the controlled substance charges Robertson faced in Nebraska. Law enforcement stated that they believed marijuana and money was the motive for the July 31st home invasion. The affidavit described how after distributing business cards in Nebraska requesting to be contacted with information about the homicide investigation, law enforcement received a call from a former co-worker of Jennings who was able to: (1) identify Jennings from a photo; (2) confirm Jennings' relationship with Patterson; (3) identify Patterson from a photo; (4) describe the area where Patterson, Jennings, and "Damo" lived; (5) express her belief that Patterson resembled the person investigators labeled suspect 2 in the press release photos and that "Damo" resembled the person labeled as suspect 3 in the photos; (6) recount that Patterson told Jennings that he was in the area on the night of the murder because he had been told about a large amount of cash in the Robertson/Brandon residence; (7) corroborate Jennings' abrupt departure from her job; (8) relay her beliefs that suddenly quitting work was out of character for Jennings and beyond Jennings' financial means to do so; and (8) convey, in a later interview, that "Damo's" brother had visited from Omaha the day before the murder.

---

[1]Due to inconsistencies in the affidavit supporting the warrant application, the magistrate judge held an evidentiary hearing to determine who applied for the warrant, who appeared before the judge and swore to the truthfulness of the statements, and how the warrant hearing was conducted in Texas. The magistrate judge found that Nebraska Officer Mathew Franken provided a draft factual statement, which Texas Special Agent Jari McPherson incorporated nearly verbatim into his application. In so doing, Special Agent McPherson erroneously stated Officer Franken was the affiant officer. The magistrate judge found that Special Agent McPherson was the affiant officer who presented the application to the judge. The judge, after reviewing the application for approximately 15 minutes, signed and issued the search warrant.

According to the affidavit, on August 14, 2018, law enforcement acquired a phone number for Dante from a reliable confidential source. When the phone number was run against cell phone tower data, it showed at 3:20 a.m. on July 31, 2018, the phone number was present in the same sector and tower that services the Robertson/Brandon residence. The same number was also connected to a tower that services the home of Dante's brother, Damon. The day before, from 2:00 to 2:30 a.m., Dante's phone number hit 38 connections off a tower that services the Robertson/Brandon residence. After receiving this information, later on August 14, 2018, Nebraska officers met with three other informants. All three of the informants identified suspect 1 from the press release photos as Dante and one of them recognized Damon as suspect 2. One of the informants advised investigators that after the press release, Dante changed his appearance by shaving his head and facial hair. The third informant told investigators that Dante said he believed there was $250,000 in a safe inside the residence, but the robbery went south after encountering all the people inside the house.

Investigating officers had reviewed motor vehicle records indicating that Patterson owned a red Chevrolet Impala with Nebraska plates. Brandon's daughter informed law enforcement that Brandon had told her that her mother said she had seen a red or maroon vehicle fleeing from their house the day before her murder. Surveillance photos captured Patterson's red vehicle in the Killeen, Texas, area. In addition, law enforcement officers observed the suspects in question unload numerous items from two vehicles—a red Malibu and a white Buick—which were also alleged to have been at the scene of the murder. Based on his training and experience, Special Agent McPherson opined that it is not uncommon for suspects to transport incriminating evidence from the scene of the crime to a "hide out." Based on the Nebraska and Texas officers' experience and training, law enforcement believed evidence of the homicide existed inside the Killeen residence where Patterson was staying. Special Agent McPherson presented the warrant application and affidavit to a Texas municipal judge. Officer Franken, although he provided information to Special Agent McPherson, did not review McPherson's affidavit before it was presented to the judge.

-6-

On August 17, 2018, the judge, who did not notice the discrepancies in identifying the affiant officer, signed the search warrant. Officers executed the warrant that same day. Law enforcement seized a smart phone, a black rubber glove with red trim, a black and red Nebraska Huskers hoodie, and a pair of tan boots. Patterson and Dante moved to suppress the evidence seized in Texas and requested a Franks[2] hearing. Patterson and Dante claimed the warrant was invalid because: (1) it was not possible to determine from reading the affidavit who wrote it, swore to its truthfulness, or tendered it to the Texas judge; and (2) it contained a reckless misrepresentation of fact by stating Dante, rather than Damon, was observed leaving the Texas residence. The magistrate judge received testimony establishing it was Special Agent McPherson who swore to the truthfulness of the statements in the affidavit, applied for the search warrant, and presented it to the judge in Texas. The magistrate judge found that Special Agent McPherson adopted the facts summarized by Officer Franken from the Nebraska investigation and added facts known to him personally or through communications with other Texas officers. The magistrate judge further found no evidence that the mix-up regarding Dante and Damon was intentional or a reckless misrepresentation. Instead, the magistrate judge found that the mistake of names was accidental and made by the assisting Texas officers who were not as conversant in the facts as the Nebraska officers. Over Patterson's and Damon's objections, the district court adopted the magistrate judge's findings and recommendation and denied the suppression motion.

The grand jury returned a five-count indictment against Patterson, Damon, Dante, and two other individuals. The government specifically alleged in the indictment that Robertson, at all times material, was engaged in illegal distribution of marijuana, a controlled substance, in and affecting interstate and foreign commerce. After a nine-day trial, the jury found Patterson and Damon guilty on the four counts pertaining to them:

---

[2]Franks v. Delaware, 438 U.S. 154 (1978).

Count One—commission of murder with a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(j)(1) and 2 (attempted Hobbs Act robbery);

Counts Two—attempted interference with commerce by robbery based on the attempted break-in on July 30, 2018, in violation of 18 U.S.C. §§ 1951 and 2;

Count Three—attempted interference with commerce by robbery based on the attempted break-in on July 31, 2018, in violation of 18 U.S.C. §§ 1951 and 2; and

Count Five—conspiracy to possess firearms in furtherance of a drug trafficking crime or crime of violence, in violation of 18 U.S.C. § 924(o).

The district court imposed the same sentence for both Patterson and Damon: life imprisonment on Count One and a consecutive term of 240 months' imprisonment on each of the three remaining counts, with these counts to run concurrent with each other. Patterson and Damon appeal, raising a number of issues, which we consider in turn.

## II.  DISCUSSION

Both Patterson and Damon appeal the denial of their suppression motions. We review the denial *de novo* and the district court's underlying factual findings for clear error. United States v. Griggs, 54 F.4th 531, 535 (8th Cir. 2022) (citation omitted). "We will reverse a district court's denial of a motion to suppress only if the district court's decision is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." United States v. Johnson, 601 F.3d 869, 872 (8th Cir. 2010) (cleaned up).

## 1. Search Warrants

### A. *Residence in Killeen, Texas*

Both Patterson and Damon challenge the validity of the warrant issued to search the residence where they were staying in Killeen, Texas. Damon contends the affidavit was severely flawed with mistakes to the point of recklessness. Based on the contents of the affidavit and testimony, he asserts inconsistencies arose because paragraphs 1-5 and 26-31 are the words of Texas Special Agent McPherson while paragraphs 6-25 are the words of Nebraska Officer Frankin. Patterson contends the district court erred in denying his motion to suppress for two reasons: (1) the issuing judge acted as a "rubber stamp" for law enforcement, and (2) probable cause is lacking because the affidavit contained a mistake of a pivotal fact.

As to Patterson's first claim, a judge reviewing a search warrant application abandons his judicial role when he "does not serve as a neutral and detached actor, but rather as a rubber stamp for the police and an adjunct law enforcement officer." United States v. Ortiz-Cervantes, 868 F.3d 695, 703 (8th Cir. 2017) (cleaned up). This Court has previously determined that an issuing judge had abandoned his judicial role when he: (1) did not read the search warrant and instead relied on what the officer told him; (2) failed to recognize the application was unsigned; and (3) did not notice the warrant failed to identify the property to be searched. United States v. Decker, 956 F.2d 773, 777 (8th Cir. 1992). The Supreme Court has found violations of the obligation to be neutral and detached where the judge possessed a pecuniary interest in issuing the warrant, Connally v. Georgia, 429 U.S. 245, 251 (1977), and where the judge actively participated in the police investigation, Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327-28 (1979).

Here, Patterson advances two arguments in support of his rubber stamp claim: (1) "the inescapable conclusion" given the discrepancies within the affidavit that no one, including the Texas judge, actually read the affidavit before the warrant was issued, and (2) even if Special Agent McPherson's testimony is credited and the

issuing judge spent 15 minutes reading the affidavit, he could not have done it in "any constitutionally meaningful sense." Patterson and Damon point to the admission from Special Agent McPherson that the affidavit was in large part cut-and-pasted from a recitation of facts received from Nebraska Officer Frankin, which resulted in inconsistencies as to who requested the warrant and who knew or saw what regarding the investigation. The district court found these drafting and signing infirmities were mere typographical errors that did not undermine probable cause. See United States v. Hyten, 5 F.3d 1154, 1156 (8th Cir. 1993). After noting Special Agent McPherson observed the Texas municipal judge read the affidavit, the district court characterized the issuing judge's failure to notice Officer Franken, not Special Agent McPherson, was listed as the affiant as an oversight, not an abandonment of his judicial role.

First, the district court credited Special Agent McPherson's testimony that the issuing judge read the supporting affidavit. "Under the clearly erroneous standard, we will reverse a finding of fact only if, despite evidence supporting the finding, the evidence as a whole leaves us with a definite and firm conviction that the finding is a mistake." United States v. Finley, 56 F.4th 1159, 1164-65 (8th Cir. 2023) (cleaned up). Patterson has not convinced us the finding is clearly erroneous.

Turning to his alternative argument, Patterson suggests the issuing judge's failure to ask any questions before signing the warrant demonstrates the issuing judge could not have considered the affidavit in any meaningful way. We have noted that a judge's silence about a search warrant application or affidavit combined with a desire to get back to bed at 2:00 a.m. might raise a question about whether the judge was actively making an independent probable cause determination. United States v. Hallam, 407 F.3d 942, 946 (8th Cir. 2005). Nonetheless, without more, such as an indication that the issuing judge was biased or impartial or evidence of a pattern of passive, automatic issuance of warrants, the evidence is insufficient to conclude the issuing judge wholly abandoned his judicial role. Id. The record here is devoid of evidence to support Patterson's claim that the issuing judge's failure to

-10-

ask questions or seek clarification signifies an abandonment of his judicial role. While it would have been prudent for the issuing judge to have paid more attention during his review of the application and affidavit, the evidence here is insufficient to demonstrate the issuing judge acted as a mere rubber stamp for law enforcement.

Patterson next claims the warrant was not supported by probable cause. We review the existence of probable cause *de novo*. United States v. Green, 39 F.4th 510, 513 (8th Cir. 2022). Although the affiant's signature is difficult to decipher, typed below the signature is "SA Jari McPherson." Despite the affidavit's shortcomings as highlighted by Patterson, the affidavit makes plain that Nebraska law enforcement officers, who were investigating a home invasion and homicide, had identified Patterson as a suspect who fled from Nebraska to Texas. The affidavit detailed the ongoing investigation and identified a motive for the home invasion/murder—to rob a drug dealer of drugs and money. Before applying for the warrant, law enforcement officers in Texas surveilled Patterson's residence and observed his red Chevrolet Impala parked in front. The officers, including Special Agent McPherson, observed the suspects unload numerous items from two vehicles alleged to have been at the scene of the murder. Special Agent McPherson averred that based on his training and experience, it is not uncommon for suspects to transport evidence—including weapons, ammunition, restraint equipment, and other items owned by the victims or other people at the scene—from the crime scene to a place where they decide to "hide out." The discord caused by Special Agent McPherson's incorporation of Officer Franken's statements regarding the investigation alone is not enough to invalidate the warrant. See Hyten, 5 F.3d at 1156 (determining that a law enforcement officer is, at a minimum, the functional equivalent of a reliable informant; therefore, the affiant's failure to delete the officer's name and insert his own name was a technical error, not a constitutional one that obviated probable cause).

In the seven-page affidavit, Patterson challenges the accuracy of only one statement—that is, whether law enforcement officers observed Dante leave the residence with Patterson (as is stated in the affidavit) or whether the individual was

Dante's brother, Damon. Patterson characterizes this accounting as "a pivotal fact." After observing Patterson and Damon leaving the residence, special agents and officers from the Texas Highway Patrol stopped the vehicle and arrested Patterson and Damon on the active homicide warrants. The district court found this mere mistake in names in the affidavit was not an intentional or reckless misrepresentation by law enforcement and ultimately it was immaterial to the probable cause determination since the challenge was to a search warrant, not an arrest warrant. We agree with the district court's assessment. Given the other unchallenged statements in the affidavit, whether it was Dante or Damon that left the residence with Patterson is immaterial to the issue of whether there was probable cause to search the residence. Patterson is seeking a level of demanding perfection, which the Fourth Amendment does not require. See United States v. Pitts, 173 F.3d 677, 680 (8th Cir. 1999) ("[T]he search warrant, while not perfect, was not constitutionally deficient.").

The district court did not err in denying Patterson's and Damon's motion to suppress evidence seized in Killeen, Texas.

### B. Residence in Lincoln, Nebraska

Patterson asserts the district court erred in declining to convene a Franks hearing to permit him to challenge the warrant issued to search his residence in Lincoln, Nebraska. Patterson contends the supporting affidavit for this search warrant contained two false statements: (1) Brandon's purported statement to her daughter that she saw three black males in a red or maroon four-door vehicle leave northbound from the area of her residence the night before her murder, and (2) the statement that Patterson is similar in appearance to a subject appearing in the surveillance video.

We review the district court's refusal to grant a Franks hearing for abuse of discretion. United States v. Nyah, 928 F.3d 694, 698 (8th Cir. 2019). A defendant asserting a search warrant is invalid because it contained false statements that were necessary to establish probable cause is entitled to a hearing only if he satisfies two

-12-

criteria: (1) "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant" in the supporting affidavit, and (2) "the allegedly false statement is necessary to the finding of probable cause." Franks, 438 U.S. at 155-56. Patterson failed to make the requisite showing.

After comparing Brandon's daughter's statements as transcribed by law enforcement officers, Patterson contends the affidavit falsely characterized her statements because Brandon did not describe the intruders the night before her murder as "black men" or identify the car as a "four door vehicle." Patterson contends falsity can be shown by the affiant's acknowledgement that the color of the car could not be ascertained from the surveillance footage. The district court found there was no material difference between the affidavit statements and Brandon's daughter's statement summary or transcript of the law enforcement interview. And, while the officer could not confirm the color of the car seen leaving during the early morning hours in the surveillance footage, Brandon's report of a red vehicle was corroborated by vehicle records. Cf. United States v. Searcy, 181 F.3d 975, 980 (8th Cir. 1999) ("Minor errors in the warrant which do not reflect deliberate falsehoods are insufficient to mandate suppression under *Franks*."). The record supports the district court's findings. Having carefully reviewed the record, Patterson has failed to demonstrate the affidavit contained false or reckless statements intended to mislead the issuing judge.

Patterson also challenges the statement in the affidavit that Patterson is similar in appearance to one of the suspects captured by the surveillance cameras. Patterson contends verification is impossible because the intruders wore ski masks at the time of the murder and the officer did not attach either Patterson's mugshot or the portion of the surveillance video used to determine similarity. As noted by the district court, Patterson failed to present any evidence discrediting the officer's statement about similarity. The district court's findings are supported by the record. As such, Patterson has failed to demonstrate the affidavit contained a false or reckless statement intended to mislead the issuing judge.

-13-

In addition, Patterson has made no showing, other than a conclusory argument, that without the disputed statements, probable cause for issuance of the warrant would be lacking. He acknowledges in his brief a number of the affiant's statements "arguably" support probable cause, including that (1) law enforcement officers received four separate tips indicating Patterson and Damon were involved in Brandon's murder; (2) a confidential informant stated that Patterson was in the area of the homicide and knew Brandon's boyfriend had a lot of money in the house; (3) Patterson's girlfriend abruptly quit her job shortly after the murder; and (4) Patterson and his girlfriend were behind on their rent and an eviction notice dated August 9, 2018, was taped to the door. In addition to these statements identified by Patterson, the affidavit also detailed other material information supporting probable cause, such as: (1) statements to law enforcement by the occupants of the Robertson/Brandon residence indicating three black males forcibly entered the house; (2) surveillance footage capturing the home intrusion along with the events the previous day where the suspects did not attempt to disguise themselves; (3) the officer's review of surveillance footage confirming that Brandon walked around outside her house the day before her murder a minute after four individuals left her backyard; and (4) reports that Patterson's girlfriend, who was five months pregnant, abruptly left town after discussing the murder and break-in with a co-worker. Setting aside the statements challenged by Patterson, the affidavit still set forth ample probable cause to search Patterson's residence. The district court did not abuse its discretion by denying the Franks request without a hearing.

## 2. Evidentiary Rulings

We review a district court's evidentiary rulings, including its decisions on motions *in limine*, for abuse of discretion. Finley, 56 F.4th at 1166-67 (quoting United States v. Banks, 43 F.4th 912, 917 (8th Cir. 2022)). Evidentiary rulings implicating constitutional rights are reviewed *de novo*. United States v. Walker, 917 F.3d 1004, 1008 (8th Cir. 2019) (quoting United States v. Pumpkin Seed, 572 F.3d 552, 558 (8th Cir. 2009)).

### A. Admission of a Video Depicting Patterson Disparaging Law Enforcement and Referencing Firearms

Patterson contends the district court erred in admitting a nine second, selfie-style video of him speaking into a phone camera. The video begins with a well-known music lyric that disparages law enforcement, then references a prior encounter with law enforcement resulting in the seizure of a firearm from Patterson, and ends with a suggestion that Patterson has more guns on hand. Patterson asserts the video was irrelevant to the charged offenses and was unfairly prejudicial under Fed. R. Evid. 403.

Among other charges, the grand jury charged Patterson with a firearms conspiracy. This charge required the government to prove, in relevant part, that on or about January 1, 2015, and continuing until approximately August 17, 2018, Patterson reached an agreement with one or more persons to knowingly possess firearms in furtherance of a drug trafficking crime or a crime of violence. Patterson recorded the video a few months prior to the home invasion and murder. The recording was not remote in time to the crime charged. Further, "[e]vidence that a defendant possessed a firearm on a previous occasion is relevant to show knowledge and intent." United States v. Walker, 470 F.3d 1271, 1274 (8th Cir. 2006) (citation omitted). Because the video contained information probative to the charged firearms conspiracy offense, the evidence was relevant. See Fed. R. Evid. 401 (defining relevant evidence as evidence that (a) "has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action"). Patterson's challenge goes to the weight of the evidence, not its admissibility, and the weight was for the jury's determination.

Rule 403 permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. While Patterson asserts the anti-police sentiment expressed in the video and his coarse language is prejudicial, he must show unfair prejudice. "Unfair prejudice means an undue tendency to suggest decision on an improper basis, including

evidence which is so inflammatory on its face as to divert the jury's attention from the material issues in the trial." United States v. Richardson, 40 F.4th 858, 867 (8th Cir. 2022) (quoting United States v. Huyck, 849 F.3d 432, 440 (8th Cir. 2017)). Patterson has failed to make the requisite showing that the video was unfairly prejudicial. The district court did not abuse its discretion in denying Patterson's motion to exclude the evidence.

### B. The 911 Recording

As noted previously, Robertson's surveillance system captured the unsuccessful break-in attempt on July 30, 2018, by four individuals and the forced entry the next morning on July 31, 2018, by three individuals. The government synchronized the July 31 video footage with the 911 call to dispatch initiated by Brandon's daughter two seconds after the intruders ran out of the residence. The 911 call recorded the moment one of Brandon's daughters discovered her mother's body at the bottom of the stairs. Her daughter is heard on the call screaming and crying. When another daughter took over the call, she is equally as distraught on the recording.

Damon, in a pretrial motion, sought to exclude the 911 recording, asserting hearsay and unfair prejudice as grounds for exclusion. While the district court noted the recording was highly emotional, it denied Damon's motion to exclude the recording on grounds that it fell within the excited utterance exception to the hearsay rule and was not unfairly prejudicial under Rule 403's balancing test. The court limited the jury's exposure to the recording, allowing the government to play the 911 recording once, either alone or in the synchronized video presentation prepared by the government. The government played the synchronized presentation for the jury as part of its case-in-chief during the testimony of Lincoln Police Department's forensic video technician, who prepared the video/audio timeline of the crime.

On appeal, Damon asserts the probative value of the 911 call was, at best, minimal; the unfair prejudice was substantial; and the jurors were encouraged to

decide the case based on an emotional plea for justice for the children. We recognize, as did the district court, the emotional nature of the 911 recording. In considering an evidentiary ruling, however, we generally give deference to the district judge who saw and heard the evidence and its impact at trial. United States v. Hellems, 866 F.3d 856, 861 (8th Cir. 2017) (citation omitted).

If there is an error in the admission of evidence, we will reverse only when an erroneous ruling prejudices the outcome of the case. United States v. Lopez, 384 F.3d 937, 942 (8th Cir. 2004). "Prejudice results when an erroneous evidentiary ruling affects the substantial rights of the defendant or when the error had a significant impact on the verdict." Id.; see United States v. Legs, 28 F.4th 931, 935 (8th Cir. 2022) (citation omitted) ("An evidentiary error is harmless when, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict."). Even if the district court erred, as Damon argues, the effect of the error did not outweigh the overall impact the inculpatory evidence presented by the government had on the ultimate verdict. The surveillance video, the victims' testimony, law enforcement officers' testimony, and the evidence seized pursuant to the search warrants pointed to Damon's involvement in the home invasion and homicide. This properly admitted evidence, taken as a whole, could suffice to convince a reasonable jury of Damon's guilt.

Damon also points to the prosecutor's emotional plea for justice for the children. Counsel objected to the prosecutor's statements near the end of her closing argument about the victims and their families located down the hall in the viewing room.[3] The prosecutor argued to the jury: "Do not make us prove beyond those two elements [for felony murder]. And I ask that for the victims' sake. The stakes are very high with your verdict for the victims and the families in this case, many of whom are in the viewing room during this trial and counting on you." The district

---

[3]The family was in another room watching the trial due to COVID-19 protocols.

-17-

court sustained counsel's objection, closing arguments were completed, and the jury was sent to the jury room to deliberate.

When counsel did not raise any issues in response to the court's inquiry of whether there were any matters to take up before recessing for the day, the court remarked in general about the closing argument objections, stating:

> There were objections made during the course of closing arguments. Those objections were promptly sustained. In the context of the entire trial and the evidence that was adduced, none of the - - none of those matters will - - I just want to take this up before we go to a motion for new trial or anything else.
>
> None of the objections or mentions arose to the level or is grounds for any type of mistrial, but if somebody wants to argue that at this point in time, I'll hear it out. None of them rose to the level of taint so as to cause unfairness or sufficient cause for new trial, but I will hear anybody if they wish to be heard.

When no one requested to be heard, the court adjourned proceedings for the day.

The next morning, Damon filed a "motion for relief," which sought to exclude individuals associated with the parties, including the defendants' family and the victim's family, from the courthouse's fifth floor while the jury deliberated. Counsel argued relief was necessary because the prosecutor urged the jurors to decide this case for the victim's family, told the jurors the family was waiting down the hall, and then the family was seen by the jurors in the commons area meeting with the prosecutor when they left. The court took up arguments on the motion after the jurors resumed deliberations.

After listening to counsel's arguments, the court made clear that the issues being raised were not the victim's family's fault, directed its frustrations at counsel, and declined to grant a mistrial, elaborating:

-18-

This case has been highly emotional, as many murder trials are, but you all are officers of the court. You control the temperature of this courtroom. It can either go up or down, and I'm suggesting that this temperature go down immediately, and you three have some control over that.

You know, this entire situation - - I'll just comment with respect to [Damon's] argument. This entire situation started about three o'clock yesterday afternoon when closing arguments began, you know. I've been doing this for 39-plus years on both sides of the bench, and I'm not sure I've ever seen closing arguments like I saw yesterday. You know, it began by the government's send a message closing argument, and that was mentioned on at least a couple of occasions.

I was looking for objections. Objections weren't forthcoming initially until the end when it culminated with the mention of the victim's family being down the hallway, and that was objected to and sustained promptly so - - but the victims have a right. I mean, they could be sitting in the courtroom. I mean, most of the time that's where they're at. So the fact that they're down the hallway really doesn't make a lot of difference, but it was improper to - - it would be improper to point to the victim's family out in the gallery just as it would down the hallway. But that objection was sustained, and then - - you know, and then it went on.

I mean, there were a couple of comments by defense counsel interjecting an opinion on the evidence. The Golden Rule was violated. There was a reference to the Court's ruling in front of the jury. I mean, I could go on and on, but you know, I was watching, you know, with seven or eight days of hard fought, which I felt, fair trial potentially swirling down the drain. I mean, I literally was watching that, and fortunately closing arguments were limited to 30 minutes, I guess.

But believe me, I carefully considered that yesterday when I asked if anyone had any motions to bring, and there were no motions to bring for a mistrial, and I did consider yesterday and I do consider now the weight of the evidence and the context of the entire trial, and I presided over the whole thing, and I balance the cumulative effect of what I'm just talking about here now in closing arguments along with what - - whatever went on in the hallway yesterday.

-19-

And I've considered all of that, and I found yesterday just as I would find today that individual arguments yesterday as well as the cumulative effect of what's gone on thus far has not arisen to unfair prejudice to either party and has not tainted the effect of the adduced evidence and the proper arguments by counsel.

The district court thoroughly considered the impropriety of the prosecutor pointing out the presence of the victim's family during closing arguments and its impact on the trial. The court promptly and properly sustained defense counsel's objection. See United States v. Alaboudi, 786 F.3d 1136, 1144 (8th Cir. 2015) ("A prosecutor should not urge a jury to convict for reasons other than the evidence; arguments intended to inflame juror emotions or implying that the jury's decision could helped solve a social problem are inappropriate."). Although the court invited further discussion after the jury left the courtroom to deliberate, counsel elected not to address the issue further or seek additional relief until the next morning.

To obtain a reversal for prosecutorial misconduct, a defendant must show both that the prosecutor's remarks were improper and that the remarks prejudiced his right to a fair trial. United States v. Bentley, 561 F.3d 803, 809 (8th Cir. 2009) (citation omitted). In considering prejudice, we look to: (1) the cumulative effect of the improprieties; (2) the strength of the evidence against the defendant; and (3) the district court's curative action, if any. United States v. Marin, 31 F.4th 1049, 1055 (8th Cir. 2022) (citation omitted). The district court noted objectionable statements during closing arguments by both the prosecutor and defense counsel, including the comment highlighted by Damon's counsel. The record contains overwhelming evidence of both Patterson's and Damon's guilt. Considering the evidence and counsel's (mostly) appropriate arguments, we cannot say the district court erred in failing to declare a mistrial *sua sponte* or abused its discretion in determining the prosecutor's statement did not satisfy the requisite prejudice to warrant a new trial. See United States v. Keleta, 949 F.3d 1082, 1092-93 (8th Cir. 2020) (affirming when, based on the evidence presented at trial, the court was convinced, beyond a reasonable doubt, that the government's misconduct could not have reasonably affected the jury's verdict).

### 3.    Sufficiency of the Evidence

Damon contends that the district court should have granted his motion for acquittal on two of the counts because there was no evidence placing him at the Robertson home on July 31, 2018.  He also seeks a new trial.  We apply the deferential sufficiency of the evidence standard to the denial of a motion for acquittal, and we review the denial of a motion for new trial for abuse of discretion. United States v. Broeker, 27 F.4th 1331, 1335 (8th Cir. 2022).

Damon's argument is premised on whether the video surveillance shows, or the witnesses saw, an individual with a red "N" sweatshirt.  The government attempted to discredit this theory during their closing argument, informing the jury that defense counsel asked questions about the sweatshirt using photos where the individual was not facing the camera.  Contrary to Damon's defense theory, witnesses at trial identified Damon in the video surveillance and in photos at trial. Patterson's girlfriend characterized Damon as Patterson's best friend.  She identified Damon in the photo law enforcement labelled as suspect 3 by his hair, mustache, black Nebraska hoodie that he wore "all the time," and red Nike bag that belonged to her.  Patterson's girlfriend testified that, after the murder, she had not seen the Nike bag or Damon's Nebraska sweatshirt.  Testing revealed the presence of gunshot residue on the Nebraska sweatshirt.  In addition, Damon's former live-in girlfriend recognized the Nebraska sweatshirt and testified that Damon wore it on a near constant basis.  Damon's grandfather also identified Damon as a person seen on the surveillance video.

Contrary to Damon's contention, there was overwhelming evidence placing him at the crime scene on July 31, 2018.  We conclude that a reasonable jury could have found Damon was present and guilty beyond a reasonable doubt on each offense submitted to them.  The district court did not err in denying Damon's motion for acquittal or abuse its direction in declining to grant a new trial.

## 4.     Sentencing Issues

### A.     Impact of <u>United States v. Taylor</u>, 142 S. Ct. 2015 (2022)

Both Patterson and Damon were charged in Count Five with a violation of 18 U.S.C. § 924(o).  Subject to certain exceptions not relevant here, § 924(o) provides that any person who conspires to commit a firearm offense under 18 U.S.C. § 924(c), may be sentenced to a maximum imprisonment term of 20 years.  The indictment alleged a firearm offense involving a multi-object conspiracy.  The district court instructed the jury that the firearms conspiracy in Count Five could be proved, in relevant part, by establishing beyond a reasonable doubt that the defendant reached an agreement to knowingly possess firearms in furtherance of either: (a) a drug trafficking crime—a conspiracy to possess marijuana with intent to distribute it, or (b) a crime of violence—conspiracy to interfere with commerce by robbery.  The jurors were further instructed that while they must unanimously agree as to at least one of the alleged purposes motivating the conspirators to act, they could also find the defendants guilty if the government proved both purposes.  None of the parties objected to the court's instructions or the general verdict form.

After briefing was complete and prior to argument, we directed the parties to provide supplemental briefs addressing the effect the Supreme Court's decision in <u>United States v. Taylor</u>, 142 S. Ct. 2015 (2022), has on this case.  In <u>Taylor</u>, the Supreme Court determined that an attempted Hobbs Act robbery is not a "crime of violence" as defined in 18 U.S.C. § 924(c).  142 S. Ct. at 2020-21.  The United States concedes that Count One must be vacated pursuant to <u>Taylor</u>, and we agree.  <u>See</u> <u>Jones v. United States</u>, 39 F.4th 523, 526 (8th Cir. 2022) (directing district court to vacate conviction under 18 U.S.C. § 924(c) because it was premised on a mistaken conclusion that conspiracy to commit Hobbs Act robbery was a crime of violence).

The United States contends that <u>Taylor</u> has no impact on the remaining counts and requests that we affirm the remaining convictions and remand for resentencing based on the sentencing package doctrine.  The United States reasons that when the

district imposed the concurrent 240-month sentences, it did so with the understanding that these sentences would be consecutive to the life sentence imposed on Count One and the district court might sentence differently in the absence of Count One. The defendants resist, asserting Taylor rendered Count Five also infirm because the first alleged object of the conspiracy—Hobbs Act robbery—is no longer a crime of violence, and the evidence was insufficient to prove the second alleged object of the conspiracy—conspiracy to possess with intent to distribute marijuana.

Because Patterson and Damon did not object in the district court to the instructions that they now challenge, "we review only for plain error." United States v. McArthur, 850 F.3d 925, 941 (8th Cir. 2017).[4] Plain error requires a defendant to show (1) an error, (2) that was plain, (3) that affected his substantial rights, and (4) that seriously affects the fairness, integrity, or reputation of judicial proceedings. United States v. Boen, 59 F.4th 983, 993 (8th Cir. 2023) (cleaned up). While there was instructional error, see United States v. Ali, 991 F.3d 561, 573 (8th Cir. 2021), and it is plain, see United States v. Perez, 46 F.4th 691, 701 (8th Cir. 2022), the error did not affect Patterson's and Damon's substantial rights.

To establish the error affected their substantial rights, Patterson and Damon must "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." United States v. Hollingshed, 940 F.3d 410, 416 (8th Cir. 2019) (quoting Molina-Martinez v. United States, 578 U.S. 189, 194 (2016)). After a comprehensive review of the record, we have little trouble concluding the evidence demonstrated that the defendants reached an agreement to

---

[4]The Supreme Court has stated these errors are subject to harmless error analysis. See Skilling v. United States, 561 U.S. 358, 414 (2010) (citing Hedgpeth v. Pulido, 555 U.S. 57, 60-61 (2008) (per curiam)). When reviewing under either plain error or harmless error, "the ultimate inquiry requires a determination as to whether the error affected substantial rights, which in most cases means whether the error was prejudicial or affected the outcome of the district court proceedings." United States v. Sayre, 400 F.3d 599, 600-01 (8th Cir. 2005) (citing United States v. Olano, 507 U.S. 725, 734 (1993)).

knowingly possess firearms and forcibly enter the Robertson/Brandon house to acquire not only money, but also marijuana. Consistent with United States v. Bell, 573 F.2d 1040 (8th Cir. 1978), the district court recounted evidence the government had introduced as co-conspirator statements made during and in furtherance of a conspiracy. Evidence material to our analysis included the following. Witness Eric Holmes testified that he supplied Robertson with large quantities of marijuana on several occasions. Holmes also testified that Boothe called Holmes before the murder (after Holmes stopped dealing with Robertson) and told Holmes that Patterson and Damon were "looking for some licks to hit." Boothe asked about Robertson and another individual. A month later, Boothe called Holmes again asking whether Robertson was still selling marijuana and whether he has a safe. The night before the murder, Boothe called Holmes a third time, seeking answers to these questions and specifically where Robertson kept money. In addition to this testimony, the court considered the phone call history between Patterson and Booth, which revealed at least five calls between the two men around the times of the attempted robberies.

Further, Patterson's girlfriend testified that in June 2018, Boothe asked Patterson and Damon to commit a home invasion, targeting an individual in the hopes of stealing drugs, money, or both. According to Patterson's girlfriend, the pair agreed to commit the robbery. After that conversation, Patterson's girlfriend saw a container with a small amount of marijuana and a duffle bag that came from the robbery. Damon told Patterson's girlfriend that they had searched through the basement, but they did not find much. In July 2018, Patterson told his girlfriend that he was "going to hit a lick," which Patterson's girlfriend understood to mean Patterson was going to commit another robbery. She overhead a conversation where Boothe told Patterson that there was expected to be over $100,000 in Robertson's house.

The district court found the evidence presented at trial was more than sufficient to establish, by a preponderance of the evidence, the existence of a conspiracy between Boothe, Patterson, and Damon to identify drug dealer targets

and rob them of cash, drugs, or both. Consistent with the evidence and the district court's Bell findings, the prosecutor argued to the jury that Patterson and Damon "robbed drug dealers. They hit licks. It's how they get their money. It's nothing to them to do a home invasion in a home full of women and children." There was no indication or argument that the defendants were seeking drugs for personal use. A reasonable jury could conclude that the evidence established the defendants' purpose for the robberies was multi-faceted—to steal marijuana and/or money, whichever (or both) they could find. Tellingly, after the first robbery, Patterson's girlfriend saw Patterson and Damon in possession of marijuana. Patterson and Damon expressed disappointment to Patterson's girlfriend because, after ransacking the basement, they were only able to find a small quantity of marijuana in a black tub along with a duffle bag that "didn't have much in it." From this evidence, a reasonable jury could find that the heist was a disappointment to Patterson and Damon because they neither found money nor obtained a large quantity of drugs that could be sold for money.

After that robbery, Patterson and Damon selected the Robertson residence for their next target based on information from other sources, such as Boothe, that there was a large quantity of marijuana and a sizable amount of cash likely to be inside the house. More specifically, Holmes testified that he charged Robertson $2,000 per pound of marijuana and Robertson paid him in cash. A transaction with Robertson could involve 20 pounds of marijuana in exchange for $40,000. Holmes further testified that because Boothe would accompany Holmes to the drug transactions, Boothe was aware of the large quantity of marijuana and cash that was being exchanged between Holmes and Robertson. Similarly, Dawon Hughes testified that he would sell to Robertson anywhere from 40 to 60 pounds of marijuana at a time in exchange for $50,000 to $60,000 in cash.

The government presented evidence from which a jury could find that one of the purposes for which Patterson and Damon forcibly entered Robertson's house was to obtain drugs to sell. Holmes testified that Boothe knew that Robertson transacted his marijuana deals in the basement, which is where at least one of the intruders headed while others zip tied occupants on the main floor. While there was

evidence that the object of the home intrusion was to obtain money, there was also evidence for a reasonable jury to find, beyond a reasonable doubt, that the defendants reached an agreement to forcibly enter Robertson's residence in furtherance of a drug trafficking crime—that is, to steal marijuana for purposes of distribution.

Given the evidence in the record, the two alleged predicate offenses for the firearms conspiracy were so inextricably intertwined that no rational juror could have found Patterson and Damon possessed firearms in relation to one predicate but not the other. To reach this result, our analysis involves more than mere evidence sufficiency. It hinges on a fact-intensive inquiry where the evidence relating to one offense is so closely tied to another offense that the conduct cannot be separated or disentangled from each other. While it would have been preferable for the jury to have been given special interrogatories or a special verdict form to facilitate effective appellate review, considering the nature of the jury instructions and the evidence submitted to the jury, we find that Patterson's and Damon's substantial rights were not affected by the jury's general verdict in this particular case. See United States v. Reed, 48 F.4th 1082, 1091 (9th Cir. 2022) ("The jury would have had to base the § 924(c) conviction on both the Hobbs Act robbery conspiracy and the drug trafficking conspiracy because they were inextricably intertwined."); see also United States v. Cannon, 987 F.3d 924, 948 (11th Cir. 2021) (disagreeing with defendants' argument that a general verdict made it "impossible to tell if the jury unanimously agreed the guns were connected to the cocaine conspiracy . . . because the trial record makes clear that the two predicate conspiracy crimes were so inextricably intertwined that no rational juror could have found that [defendants] carried a firearm in relation to one predicate but not the other").

### B. Sentencing Package Doctrine

With the vacatur of Count One, the government urges remand for resentencing on the remaining counts under the sentencing package doctrine. Patterson and Damon faced a statutory maximum imprisonment term of 20 years on Count Two and on Three, see 18 U.S.C. § 1951, and a maximum imprisonment term on Count

Five of 20 years, see 18 U.S.C. § 924(o). The sentencing package doctrine allows us to "vacate the entire sentence on all counts so that, on remand, the trial court can reconfigure the sentencing plan to ensure that it remains adequate to satisfy the sentencing factors in 18 U.S.C. § 3553(a)." United States v. McArthur, 850 F.3d 925, 943 (8th Cir. 2017) (quoting Greenlaw v. United States, 554 U.S. 237, 253 (2008)). This doctrine is often applied in cases involving multiple counts and a successful attack by a defendant on some, but not all, counts of conviction. Id.

We find this case to be an appropriate case for application of the sentencing package doctrine. Because the convictions that remain valid were imposed by the district court on the assumption that the defendants would serve a life sentence, and the life sentence having now been vacated, the district court should have an opportunity to decide whether concurrent terms of 240 months' imprisonment are sufficient to comply with the purposes set forth in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3584 (authorizing district courts, except when an attempt and other offense that was the sole objective of the attempt are involved, to order multiple terms of imprisonment to run concurrently or consecutively). Since we are vacating the sentences on all remaining counts, we need not resolve Damon's additional challenges to the reasonableness of his sentence or suggestion that a more reasonable sentence would be consistent with the guidelines for second degree murder.

## III.  CONCLUSION

For the foregoing reasons, we vacate Patterson's and Damon's conviction and sentence on Count One and direct the district court to dismiss Count One. We affirm the remaining convictions, vacate Patterson's and Damon's remaining sentences under the sentencing package doctrine, and remand for resentencing.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion with one exception: I would vacate the defendants' convictions on Count Five, the conspiracy to possess firearms in furtherance of another offense.

As the court explains, Patterson and Williams were convicted of a firearms conspiracy in violation of 18 U.S.C. § 924(o). That statute proscribes "conspir[ing] to commit an offense under" 18 U.S.C. § 924(c), and § 924(c) proscribes in relevant part possessing a firearm "in furtherance of" a "crime of violence or drug trafficking crime." Accordingly, to convict Patterson and Williams of conspiracy under § 924(o), the government needed to prove that they conspired to possess firearms in furtherance of a "crime of violence" or "drug trafficking crime." See United States v. Flax, 988 F.3d 1068, 1073 (8th Cir. 2021) (listing the elements of firearms conspiracy under § 924(o)).

Here, the defendants were charged in Count Five of the indictment with conspiring to "knowingly possess firearms in furtherance of" both a crime of violence—specifically, conspiracy to commit Hobbs Act robbery, see 18 U.S.C. § 1951(a)—and a drug trafficking crime—specifically, conspiracy to possess with intent to distribute marijuana, see 21 U.S.C. § 846. At trial, the jury was instructed that it could find Patterson and Williams guilty on Count Five if it found beyond a reasonable doubt that they conspired to possess firearms in furtherance of either of the two § 924(c) predicate crimes charged in the indictment. And the jurors were further instructed that they had to unanimously agree on the object of the charged firearms conspiracy. Yet the jury returned a general verdict: it found the defendants guilty of "conspiracy to possess firearms in furtherance of a drug trafficking crime or a crime of violence" without specifying whether it based its conviction on the former predicate, the latter one, or both.

At the time, the lack of specificity in the verdict form was not a cause for concern. When Patterson and Williams went to trial, conspiracy to possess marijuana with the intent to distribute it and conspiracy to commit Hobbs Act robbery were both valid § 924(c) predicates under then-current law. The law has

-28-

since changed, however. While the defendants' appeals were still pending, the Supreme Court held in United States v. Taylor, 142 S. Ct. 2015, 2020 (2022), that attempted Hobbs Act robbery does not qualify as a predicate crime of violence under § 924(c). And two weeks later, we held in Jones v. United States, 39 F.4th 523, 526 (8th Cir. 2022), that conspiracy to commit Hobbs Act robbery does not "constitute[] a crime of violence" under § 924(c) either.

The result for this case is that Taylor and Jones have rendered one of the potential bases for Patterson's and Williams's § 924(o) convictions—namely, that they conspired to possess firearms in furtherance of a conspiracy to commit Hobbs Act robbery—legally invalid. See 18 U.S.C. § 924(o) (prohibiting in relevant part conspiracies to possess firearms in furtherance of a predicate "crime of violence" or "drug trafficking crime"); see also United States v. McArthur, 850 F.3d 925, 941 (8th Cir. 2017) (observing that Supreme Court decisions "apply . . . retroactively to cases on direct review").

Patterson and Williams concede that the other potential basis remains legally valid because conspiracy to possess marijuana with the intent to distribute qualifies as a drug trafficking predicate. See 18 U.S.C. § 924(c)(2); 21 U.S.C. § 846. But the defendants' convictions on Count Five were based on a general verdict, and the Supreme Court has made clear that "[a] conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam). That is what happened here: the jury was presented with two theories of guilt for the § 924(o) offense charged in Count Five—one based on a valid drug trafficking predicate and the other based on a now-invalid crime of violence predicate—and it "may have relied on" the latter theory "to the exclusion of" the former theory. United States v. Jones, 935 F.3d 266, 270 (5th Cir. 2019) (per curiam) (addressing a challenge to § 924 convictions that, because the jury returned a general verdict, could have been based on an invalid crime of violence predicate).

As the court notes, our review in this case is for plain error. See United States v. Ali, 991 F.3d 561, 571–72 (4th Cir. 2021) (reviewing for plain error the validity of a § 924(c) conviction where "one of the two theories of guilt" involved an invalid crime of violence predicate); Jones, 935 F.3d at 270 (same). But unlike the court, I believe the plain instructional error here affected Patterson's and Williams's substantial rights. An error affects a defendant's substantial rights if the defendant "shows a reasonable probability that, but for the error, the outcome of the proceeding would have been different." United States v. Davies, 942 F.3d 871, 873 (8th Cir. 2019) (cleaned up) (quoting Molina-Martinez v. United States, 578 U.S. 189, 194 (2016)). That means Patterson and Williams must show there is a reasonable probability that had the marijuana conspiracy been the only available § 924(c) predicate for Count Five, they would not have been convicted on that count. See Jones, 935 F.3d at 274 (finding plain error after concluding that the record evidence "demonstrate[d] a reasonable probability that the jury would not have convicted" the defendants of § 924 offenses "if the invalid crime of violence predicate were not included on the verdict form").

In my view, they have made such a showing here. To start, there was enough evidence presented at trial for a jury to conclude that the sole object of Patterson's and Williams's firearms conspiracy was to steal money, which would have been consistent with a Hobbs Act robbery conspiracy but not with a marijuana conspiracy.[5] For instance, Keyana Clark-Jennings, who was Patterson's girlfriend at the time, testified that money was "tight" for Patterson and Williams in the summer of 2018. She explained that the two agreed to rob Michael Robertson after William Boothe "told" them "about the money" that Robertson kept in his house. Clark-Jennings stated more than once that Patterson and Williams expected to find

---

[5]As explained in the jury instructions, Patterson and Williams could have been found guilty on Count Five based on the marijuana conspiracy predicate only if the jury unanimously found that the defendants agreed to possess firearms in furtherance of an agreement to possess marijuana—not money—for the purpose of distributing at least some of it to others. And an agreement to simply possess marijuana would not have been sufficient.

over $100,000 at Robertson's residence. Another witness testified that on the night before the July 31 break-in, Boothe called to ask where in the house Robertson kept his money. And Clark-Jennings testified that following the break-in, Patterson and Williams looked "disappointed" after they learned about the large stash of money police seized from Robertson, which jurors could have interpreted as proof that the two regretted not finding that money themselves. It is thus "entirely plausible" that the jury, believing that Patterson and Williams were after money alone, rested its Count Five verdict on the invalid Hobbs Act robbery conspiracy predicate.[6] United States v. Capers, 20 F.4th 105, 124 (2d Cir. 2021) (concluding that an instructional error affected substantial rights in part because there was enough evidence at trial to support a guilty verdict based on an invalid § 924(c) predicate); see Jones, 935 F.3d at 273 (concluding that an instructional error affected substantial rights in part because "[a] reasonable probability remain[ed]" that the jury "relied upon" conduct consistent with an invalid § 924(c) predicate to convict the defendants of several § 924 offenses).

There is likewise a reasonable probability that the jury did not rest its Count Five verdict on the valid marijuana conspiracy predicate. See United States v. Said, 26 F.4th 653, 661 (4th Cir. 2022) ("[T]he defendant must show not only that he *could* have been convicted under the erroneous instruction, but also that he *was not* convicted under the proper instruction." (cleaned up)). Patterson and Williams were not charged with, let alone found guilty of, any standalone controlled substance offenses. It thus cannot be said that the jury conclusively found that Patterson or Williams engaged in any sort of drug-trafficking-related conduct that would have, in turn, clearly supported a § 924(o) conviction based on a drug trafficking predicate. Cf. Said, 26 F.4th at 662 (concluding that a § 924-related instructional error was harmless because "common sense" suggested that a jury "that found [the defendant] guilty of several substantive crimes of violence" based a separate § 924(c) conviction on at least one of those valid predicates). Nor did the government offer

---

[6]Notably, the government opened its closing argument with the following: "Tawhyne Patterson and Damon Williams weren't successful at stealing any money from [Robertson's] home on July 31st, 2018, but they did steal a life."

any direct evidence at trial that Patterson or Williams distributed marijuana or were otherwise involved in drug trafficking, so it cannot be inferred from the trial record that the marijuana conspiracy predicate obviously served as a basis for the jury's Count Five verdict. Cf. Ali, 991 F.3d at 576 (concluding that a § 924-related instructional error did not affect substantial rights because the "overwhelming weight of the evidence . . . presented at trial" supported a theory of guilt based on a valid § 924(c) predicate).

The court concludes that the defendants' § 924(o) convictions can stand because the evidence presented at trial "demonstrated that the defendants reached an agreement" to possess firearms in furtherance of a marijuana conspiracy. And it further concludes that a "reasonable jury could find" from that evidence that "one of the purposes for which" the defendants forcibly entered Robertson's home "was to obtain drugs to sell." I suggest these are not the relevant inquiries.[7] But in any event,

---

[7]The critical question here is not whether we believe the trial evidence demonstrated that the defendants conspired to possess firearms in furtherance of a marijuana conspiracy, but whether the jury so concluded beyond a reasonable doubt. See, e.g., United States v. McClaren, 13 F.4th 386, 414 (5th Cir. 2021) ("[W]e cannot determine whether *the jury* relied on the [invalid] or [valid] predicate . . . ." (emphasis added)); see also United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978) ("The ordinary civil standard of *preponderance of the evidence* is sufficient since the district court is ruling on admissibility rather than ultimate guilt." (emphasis added)). And given the general verdict and the nature of the trial evidence, we simply cannot determine definitively that it did so. Additionally, saying that a "reasonable jury could find" from the trial evidence that the defendants intended to steal marijuana from Robertson and then sell it themselves is akin to applying a sufficiency-of-the-evidence standard. See, e.g., United States v. Perez, 61 F.4th 623, 627 (8th Cir. 2023) ("We will overturn a conviction on appeal [for lack of sufficient evidence] only if no *reasonable jury could have found* the defendant guilty beyond a reasonable doubt." (emphasis added)). Rather, the relevant inquiry is whether there is a "reasonable probability" that the jury did not base its Count Five guilty verdict on the marijuana conspiracy predicate but, instead, rested its verdict on the invalid Hobbs Act robbery conspiracy predicate. See Jones, 935 F.3d at 273 ("A reasonable probability remains that the jury relied upon [conduct

-32-

much of the evidence the court cites equally supported a conviction based solely on the invalid Hobbs Act robbery conspiracy predicate.  The fact that Robertson stored large quantities of marijuana in his house, for example, meant that he likely also had large quantities of cash on hand as a result.  See Taylor v. United States, 579 U.S. 301, 303 (2016) ("For obvious reasons, drug dealers are more likely than ordinary citizens to keep large quantities of cash and illegal drugs in their homes . . . .").  Indeed, police seized roughly $85,000 from Robertson following the July 31 break-in.  Based on the testimony at trial, the jury could have readily concluded that Patterson and Williams targeted Robertson for his money without necessarily concluding that they planned to take his marijuana—with the requisite intent to distribute it—as well.  The evidence established that Patterson and Williams robbed a drug dealer because, with drugs, comes money.  But there was little to no evidence that Patterson and Williams entered a conspiracy to possess firearms in furtherance of a joint effort to possess marijuana with the intent to distribute it.[8]

For these same reasons, the Hobbs Act robbery conspiracy and marijuana conspiracy predicates were not so "inextricably intertwined" that no rational juror could have found the defendants guilty on Count Five based on one predicate but not the other.  Reed and Cannon support this conclusion.  In both cases, the defendants agreed with undercover officers to rob drug stash houses that turned out to be fake, and they were subsequently charged under § 924(c) for carrying firearms during and in relation to a crime of violence (i.e., conspiracy to commit Hobbs Act

related to an invalid § 924(c) predicate] . . . to convict [the defendants] of the challenged § 924 offenses." (emphasis added)).

[8]As for the June 2018 robbery that Clark-Jennings described in her testimony, there is no evidence in the trial record suggesting that the defendants sold or intended to sell the small amount of marijuana they apparently acquired during that incident.  And when the government offered evidence of this prior conduct at trial, it explained during a sidebar that it was relevant because the defendants "are charged in a firearms conspiracy to possess guns in furtherance of crimes of violence, which would include robberies of drug distributors."  No effort was made to characterize the prior conduct as a drug trafficking crime.

robbery) and a drug trafficking crime (i.e., cocaine conspiracy).  See United States v. Reed, 48 F.4th 1082, 1084 (9th Cir. 2022); United States v. Cannon, 987 F.3d 924, 931, 946 (11th Cir. 2021).  In both cases, the jury found the defendants guilty on the § 924(c) counts based on a general verdict, and the defendants appealed, arguing it was unclear whether they had been unanimously convicted on the now-invalid Hobbs Act robbery conspiracy predicate or on the still-valid cocaine conspiracy predicate.  Notably, the defendants in both cases had been told that the stash houses they agreed to rob held large quantities of cocaine.  See Reed, 48 F.4th at 1091 (noting that the defendant was told that "there would be 22 to 39 kilograms of cocaine in the stash house"); Cannon, 987 F.3d at 934 ("The [confidential informant] confirmed there would be 18 kilograms of cocaine in the stash house.").  And in both cases, there was no question that "the goal of the robbery scheme[s] was to steal cocaine from a stash house so [the defendants] could then distribute it themselves."  Cannon, 987 F.3d at 948; see Reed, 48 F.4th at 1091 ("The logical conclusion is that [the defendant] understood [he and his co-conspirators] were robbing the stash house to obtain cocaine with the intent to sell it.").  Each defendant, in short, had agreed to steal drugs for the purpose of furthering a drug trafficking conspiracy, and each defendant was separately convicted on a drug trafficking conspiracy count.  On these facts, the Ninth and Eleventh Circuits thus concluded that the defendants' Hobbs Act robbery conspiracy and cocaine conspiracy predicates were so "inextricably intertwined" that their § 924(c) convictions "necessarily rested on *both*" predicates, meaning in turn that the instructional errors at issue were harmless.  Reed, 48 F.4th at 1090; see Cannon, 987 F.3d at 950.

Here, in contrast, Patterson and Williams agreed to rob a house that they believed contained large quantities of cash and drugs.  Cf. Reed, 48 F.4th at 1091 ("[The defendant] knew the stash house would contain only drugs and no money because [the undercover officer] told him so at their first meeting.").  And unlike the defendants in Reed and Cannon, neither Patterson nor Williams was charged with or convicted on a separate drug trafficking conspiracy count that would have lent support to the idea that the conspiracy predicates here were "inextricably intertwined."  In light of the evidence presented at trial, the jury could very easily

-34-

have concluded that Patterson and Williams intended to steal money, and that any drugs they also found in Robertson's house were merely incidental to the agreed-upon goal of their conspiracy. Cf. id. ("[T]he evidence shows that the object of the robbery was to distribute cocaine, not for some other purpose.").

In sum, nothing in the record before us allows us to conclude that the jury "necessarily rested" its Count Five verdict on the marijuana conspiracy predicate. Capers, 20 F.4th at 127. It follows, then, that there is a reasonable probability that Patterson and Williams were convicted of a firearms conspiracy based on an invalid Hobbs Act robbery conspiracy predicate, see id., and that, but for the erroneous inclusion of that predicate in the jury instructions, the outcome of their trial "would have been different" as to Count Five. Davies, 942 F.3d at 873 (quoting Molina-Martinez, 578 U.S. at 194). That instructional error therefore affected the defendants' substantial rights.

Finally, that error also "seriously affects" the fairness and integrity of the judicial proceedings here. Taylor, 44 F.4th at 794. Whether the defendants' convictions on Count Five stand will affect the potential sentence the district court can impose on remand. The convictions on which the defendants received life sentences will be vacated, and I have no quarrel with giving the district court an opportunity to "reconfigure" the defendants' sentences for the remaining counts of conviction so as to "ensure" that those sentences "remain[] adequate to satisfy" the applicable sentencing factors. McArthur, 850 F.3d at 943. But as the court acknowledges, the district court may decide to impose consecutive terms of imprisonment on those remaining counts, including Count Five. See 18 U.S.C. § 924(o) (authorizing a maximum term of imprisonment of 20 years). Because I believe Count Five should be vacated as well, I am also of the view that it should play no part in the sentence on remand, much less form the basis of a consecutive term of imprisonment. See United States v. Pirani, 406 F.3d 543, 553–54 (8th Cir. 2005) ("[T]he fairness, integrity, and public reputation of judicial proceedings are

seriously affected when a defendant must spend additional time in prison on account of an illegal sentence.").

_____